# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| BRAD HALL & ASSOCIATES, INC., et al., | Case No.: 2:23-cv-00213-APG-DJA |
| Plaintiffs | **Order Granting in Part and Denying in Part Motions for Summary Judgment** |
| v. | [ECF Nos. 23, 25] |
| RSUI INDEMNITY COMPANY, | |
| Defendant | |

This is an insurance coverage dispute between the plaintiffs (collectively, Teton) and their excess insurer, defendant RSUI Indemnity Company (RSUI).  The parties filed summary judgment motions seeking a ruling on how to interpret the language in RSUI's excess policy.  I held a hearing on the motions on January 25, 2024.  For the reasons explained at the hearing and in this order, I grant in part both sides' motions.

## I.  BACKGROUND

On February 7, 2021, Teton's driver was driving a tractor hauling two trailers containing fuel when he caused an accident that resulted in property damage, bodily injuries, and two separate fuel spills.  One fuel spill came from the tractor on one side of the highway, while the spill on the other side of the highway came from the trailers.  When the accident occurred, the Nevada Department of Transportation dispatched Clean Harbors, an emergency response contractor, to perform emergency pollution mitigation work. ECF No. 24-1 at 9.

On February 9, the Nevada Division of Environmental Protection (NDEP) sent Teton a letter requesting an evaluation of the spill under various sections of the Nevada Administrative Code. ECF No. 24-4.  That letter advised Teton that it "may be required per [the Nevada Administrative Code] to perform cleanup activities related to the Release." *Id.* at 2.  The letter

1 | told Teton that it "should make every effort to assess the site and conduct cleanup as quickly as

2 | possible." *Id.* at 3.

3 | According to Teton's executive vice president of legal affairs and general counsel, Teton

4 | engaged environmental contractors on February 7 to provide emergency response and cleanup

5 | services before it heard from NDEP. ECF No. 29-3 at 3.  He states that the trucking company

6 | took action to clean up and remediate the fuel spills because of the accident, not because of any

7 | communication it received from NDEP. *Id.*

8 | Teton hired Environmental Technology, Inc. (EN TECH) to perform mitigation measures

9 | from March 8 to 12. ECF No. 24-1 at 12.  EN TECH also engaged in cleanup and remediation

10 | activities from August to November 2021, and conducted groundwater monitoring for several

11 | months thereafter. *Id.* at 16; ECF No. 24-5 at 5.  In November 2022, NDEP sent a letter to Teton

12 | indicating that no further action was needed at the site. ECF No. 24-6.  Total cleanup and

13 | remediation costs exceeded $4 million. ECF No. 26-3 at 3.

14 | Teton had three insurance policies relevant to the accident.  First, it had a policy with

15 | Crum & Forster that provided coverage for pollution. ECF No. 24-2.  Second, it had a policy

16 | with Zurich for business automobile coverage. ECF No. 26-2.  Finally, it had an excess policy

17 | with RSUI. ECF No. 26-1.  The RSUI policy is excess to the Zurich policy only. *Id.* at 4.  I

18 | therefore do not discuss the Crum & Forster policy further.

19 | Zurich accepted and paid coverage for property damage to the tractor and trailers,

20 | personal injuries to the other driver, and remediation costs for the fuel spilled from the tractor,

21 | but not for the fuel spilled from the trailers. ECF Nos. 26-4 at 3; 26-9 at 6.  The Zurich policy

22 | limit was exhausted upon paying out these claims. ECF No. 26-4 at 3.

23 |

1    RSUI accepted coverage as the excess insurer for personal injuries to the other driver and

2    property damage to the tractor and trailers. ECF No. 26-5 at 14.  But it declined to accept

3    coverage for any remediation. *Id.* at 16.  As to the fuel spill from the trailers, RSUI asserted that

4    its policy followed form with Zurich's, and Zurich provided no coverage for the spill from the

5    trailers. *Id.* at 3, 14.  Additionally, it asserted that although Zurich covered the remediation costs

6    for the fuel spilled from the tractor, RSUI would not because its policy has a pollution exclusion.

7    *Id.* at 15.

8    Teton thereafter sued RSUI, asserting claims for breach of contract, declaratory

9    judgment, bad faith, and unfair claims practices. ECF No. 1.  The parties agreed that rather than

10    engage in discovery, they would file early summary judgment motions on the issue of the excess

11    policy's coverage, because that is a question of law for the court. ECF No. 20.  Those summary

12    judgment motions are now before me.

13    **II.  ANALYSIS**

14    Summary judgment is appropriate if the movant shows "there is no genuine dispute as to

15    any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

16    56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."

17    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if "the evidence

18    is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

19    The party seeking summary judgment bears the initial burden of informing the court of

20    the basis for its motion and identifying those portions of the record that demonstrate the absence

21    of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The

22    burden then shifts to the non-moving party to set forth specific facts demonstrating there is a

23    genuine issue of material fact for trial. *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th

Cir. 2018) ("To defeat summary judgment, the nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy its burden at trial.").  I view the evidence and reasonable inferences in the light most favorable to the non-moving party. *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 440-41 (9th Cir. 2017).

The parties agree I should apply Nevada law regarding the interpretation of an insurance contract.  Under Nevada law, the interpretation of an insurance policy is a question of law for the court. *Starr Surplus Lines Ins. Co. v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, 535 P.3d 254, 260 (Nev. 2023) (en banc).  "The purpose of contract interpretation is to determine the parties' intent when they entered into the contract." *Century Sur. Co. v. Casino West, Inc.*, 329 P.3d 614, 616 (Nev. 2014) (en banc).  I interpret the policy language "from the perspective of one not trained in law or in insurance, with the terms of the contract viewed in their plain, ordinary and popular sense." *Id.* (quotation omitted).  I view "the policy as a whole to give reasonable and harmonious meaning to the entire policy." *Id.* (quotation omitted).  An interpretation "should not lead to an absurd or unreasonable result." *Id.*

If the policy's language is unambiguous, I "interpret it according to the plain meaning of its terms." *Id.*  A policy is considered ambiguous if "it creates [multiple] reasonable expectations of coverage as drafted." *Id.* (quotation omitted).  Ambiguities are construed against RSUI as the drafter. *Id.*  If "an insurance policy has any ambiguous terms," then I must "interpret the policy to effectuate the insured's reasonable expectations." *Id.*

I interpret clauses providing coverage broadly "to afford the greatest possible coverage to the insured, [and] clauses excluding coverage are interpreted narrowly against the insurer." *Id.* (quotation omitted).  Exclusions must be "narrowly tailored" to "clearly and distinctly communicate[] to the insured the nature of the limitation, and specifically delineate[] what is and

1  is not covered." *Id.* (quotation omitted).  "To preclude coverage under an insurance policy's

2  exclusion provision, an insurer must (1) draft the exclusion in obvious and unambiguous

3  language, (2) demonstrate that the interpretation excluding coverage is the only reasonable

4  interpretation of the exclusionary provision, and (3) establish that the exclusion plainly applies to

5  the particular case before the court." *Id.* (quotation omitted).

6       I begin with the excess policy's language.  The insuring clause states that RSUI "will pay

7  those sums in excess of [Zurich's policy] that [the insured] become[s] legally obligated to pay as

8  damages because of injury to which this insurance applies, providing that [Zurich's policy] also

9  applies, or would apply but for the exhaustion of its applicable Limits of Insurance." ECF No.

10  26-1 at 19.  The excess policy is "subject to the same terms, conditions, agreements, exclusions

11  and definitions" as the Zurich policy, except "[w]ith respect to any provisions to the contrary" in

12  the excess policy. *Id.*  In other words, the Zurich policy defines the coverage, exclusions, and

13  exceptions to the exclusions, unless something contrary appears in the excess policy, in which

14  case the excess policy's language controls.

15       Turning to Zurich's policy, the coverage provision states that Zurich "will pay all sums

16  an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to

17  which this insurance applies, caused by an 'accident' and resulting from the ownership,

18  maintenance or use of a covered 'auto'." ECF No. 26-2 at 54.  There is no dispute that the tractor

19  is a covered auto.

20       The insuring clause also states that Zurich will "pay all sums an 'insured' legally must

21  pay as a 'covered pollution cost or expense' to which this insurance applies, caused by an

22  'accident' and resulting from the ownership, maintenance or use of covered 'autos'." *Id.*  It

23  defines a "covered pollution cost or expense" to mean "any cost or expense arising out of . . .

[a]ny request, demand, order or statutory or regulatory requirement that any 'insured' or others"

test, monitor, or clean up pollutants; or a claim or suit by a governmental authority "for damages

because of" testing, monitoring, or cleaning up a pollutant. *Id.* at 62.  The parties do not dispute

that the fuels spilled from the tractor and the trailers qualify as pollutants.

The Zurich policy has numerous exclusions from coverage.  As relevant here, exclusion

11.a states that Zurich will not pay for bodily injury or property damage arising out of the

seepage or release of pollutants:

> a.  That are, or that are contained in any property that is:
>    (1) Being transported or towed by, handled or handled for movement into,
>    onto or from the covered "auto";
>    (2) Otherwise in the course of transit by or on behalf of the "insured"; or
>    (3) Being stored, disposed of, treated or processed in or upon the covered
>    "auto".

*Id.* at 54.  Paragraph 11.a thus excludes coverage for the fuel spilled from the trailers because the

covered auto was towing the trailers.  Zurich denied coverage for the fuel spilled from the trailers

on this basis. ECF No. 26-9 at 4-6.  And because the excess policy adopts this exclusion,

coverage for the fuel spilled from the trailers is also excluded under RSUI's excess policy unless

something in the excess policy provides for coverage.

As for the fuel spilled from the tractor, Zurich accepted coverage under the exception to

the exclusion in paragraph 11.a, which provides that paragraph 11.a does not exclude fuels "that

are needed for or result from the normal electrical, hydraulic or mechanical functioning of the

covered 'auto' or its parts" if the pollutants are released "directly from an 'auto' part designed by

its manufacturer to hold . . . such 'pollutants.'" ECF No. 26-2 at 54.  The fuel spilled from the

tractor's gas tank falls under this exception, so Zurich covered it. ECF No. 26-9 at 6.  Because

the RSUI excess policy has the same coverage, exclusions, and exceptions as the Zurich policy,

1   it therefore covers the fuel spilled from the tractor unless something in the excess policy

2   excludes it.

3        The heart of the parties' dispute revolves around an exclusion in RSUI's policy.  The

4   excess policy has an endorsement entitled "Total Pollution Exclusion - With Collision/Upset

5   Exception." ECF No. 26-1 at 14.  The Total Pollution Exclusion states:

6        This insurance shall not apply to:

7            1.  Any liability which would not have occurred in whole or in part but for
             the actual, alleged or threatened discharge, dispersal, seepage, migration, release
8            or escape of "pollutants" at any time.

9            2.  Any loss, cost or expense arising out of any:

10               a.  Request, demand or order that any insured or others test for,
                 monitor, clean up, remove, contain, treat, detoxify or neutralize, or
11               in any way respond to, or assess the effects of "pollutants"; or

12               b.  Claim or suit by or on behalf of a governmental authority for
                 damages because of testing for, monitoring, cleaning up, removing,
13               containing, treating, detoxifying or neutralizing, or in any way
                 responding to, or assessing the effects of "pollutants."

14
         However, insofar as coverage is afforded by the [Zurich policy], for the full limits
15           shown therein, paragraph 1. of this exclusion does not apply to any liability
             arising out of the collision or upset of a motor vehicle.

16

17  *Id.*

18       Teton argues that the "however" paragraph creates coverage under the excess policy that

19  is broader than Zurich's policy because that paragraph states that the pollution exclusion does not

20  apply to "any liability" arising out of the upset of a vehicle, and that is what happened here.  I

21  reject that reading of the policy as contrary to its plain and unambiguous language.  The

22  endorsement is an exclusion, and the "however" paragraph is an exception to that exclusion.  It is

23  not a coverage provision.  The language in the "however" paragraph merely states that the

7

exclusion in paragraph 1 does not apply when liability arises out of the upset of a vehicle.  In other words, it eliminates exclusion 1 from the policy.  But it does not write in coverage for any liability arising out of the upset of a vehicle.  No reasonable reading of the language would support a finding that this exception to an exclusion is actually a coverage clause creating broader coverage than that provided under the Zurich policy.  So, the fuel spilled by the trailers is not covered by the excess policy because it was not covered by the Zurich policy and the elimination of paragraph 1 of the pollution exclusion in the excess policy does not create coverage that did not exist under the Zurich policy.

That leaves the fuel spilled from the tractor.  RSUI contends that even if paragraph 1 is read out of the policy, paragraph 2 to this endorsement still applies and excludes coverage. Teton argues that paragraph 2 does not apply because Teton's liability was not triggered by a governmental demand that it clean up the fuel.  Rather, it contends that the circumstances of the accident required it to clean up the fuel.  Teton contends that regardless of a government request or order, it would have had to clean up the spill.  And it contends that this is shown by the fact that it contacted contractors to remediate the spill before it heard from NDEP.  RSUI responds that paragraph 2.a does not require that the request come from a governmental authority.  Rather, anyone requesting or demanding Teton to clean up the fuel would trigger the exclusion.  RSUI also notes that NDEP made a request within two days of the accident, so the costs were incurred arising out of a request or demand to clean up the spill.

The Zurich policy provided coverage for the tractor fuel spill as a "covered pollution cost or expense," which the policy defined as a cost arising out of "[a]ny request, demand, order or statutory or regulatory requirement" that the insured clean up a pollutant.  The excess policy's pollution exclusion excluded costs arising from a request, demand, or order to clean up a

pollutant.  But it did not exclude costs arising from a statutory or regulatory requirement to clean up.  RSUI mirrored this section of the Zurich policy almost verbatim, with the lone difference being that it struck the phrase "statutory or regulatory requirement" that was in the Zurich policy. I must take the policies by their plain language, construe any ambiguities against RSUI, and read any exclusion narrowly.  So, comparing the language of the excess policy's total pollution exclusion to the Zurich policy's definition of a covered pollution expense, RSUI excluded costs arising from a request, demand, or order, but not costs arising from a statutory or regulatory obligation.  If RSUI meant to also exclude costs arising from a statutory or regulatory requirement, it could and should have clearly and distinctly communicated that in the policy. RSUI's interpretation excluding all coverage is not the only reasonable interpretation of paragraph 2 because paragraph 2 does not clearly and unambiguously exclude costs arising from a statutory or regulatory requirement.  Therefore, the excess policy covers the fuel spilled from the tractor if the costs to clean up the tractor's fuel arose from a statutory or regulatory obligation but not if the costs arose from a request, demand, or order to clean up.

## III.  CONCLUSION

I THEREFORE ORDER that the defendant's motion for summary judgment **(ECF No. 23) is GRANTED in part** as described above.

I FURTHER ORDER that the plaintiffs' motion for summary judgment **(ECF No. 25) is GRANTED in part** as described above.

DATED this 26th day of January, 2024.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE